Filed 6/10/13  Medic Ambulance Service v. Solano Emergency Medical Services Cooperative CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MEDIC AMBULANCE SERVICE, INC.,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>SOLANO EMERGENCY MEDICAL SERVICES COOPERATIVE,<br><br>        Defendant and Respondent. | A134772<br><br>(Solano County<br>Super. Ct. No. FCS034250) |

**I.**

**INTRODUCTION**

Appellant Medic Ambulance Service, Inc. (Medic) had a contract (the Agreement) with respondent Solano Emergency Medical Services Cooperative (SEMSC), a government agency, that gave Medic the exclusive right to provide advanced life support (ALS) ambulance services in a specified geographical area.  The Agreement obligated SEMSC to enforce Medic's exclusivity rights, and provided for a contractual claims procedure in the event of a dispute.  After Medic learned that some ALS ambulance transports were being handled by competing ambulance services, the parties engaged in informal communications and negotiations regarding the enforcement of Medic's exclusivity rights.  These efforts were unsuccessful, and Medic sued for breach of contract.

SEMSC demurred on the basis of Medic's failure to follow the contractual claims procedure.  Medic amended its complaint to allege that SEMSC was estopped from

1

relying on Medic's failure to comply with the contractual claims procedure as a bar to Medic's damages claims. The trial court found Medic's estoppel allegations insufficient, and sustained SEMSC's renewed demurrer without leave to amend. On this appeal, we hold Medic's fourth amended complaint pleaded sufficient facts to support Medic's estoppel claim. We therefore reverse, and remand for further proceedings.

## II.

## FACTS AND PROCEDURAL BACKGROUND

### A. The Agreement

The Agreement between SEMSC and Medic was entered into in April 2000, and was periodically extended so that it was in effect continuously through April 2010. It provides that SEMSC will require that all 911 calls for ambulance services in Medic's exclusive operating area be directed to Medic. It imposes various obligations on Medic with regard to the number and qualifications of emergency paramedical personnel with whom Medic is required to staff its ambulances; the level of service Medic is required to deliver, the standby and special event coverage Medic is required to provide; and the insurance and bonding Medic is required to maintain. It provides that Medic can provide critical care transport, but not in response to 911 calls unless expressly requested. It specifies the compensation Medic shall receive for delivering services; the rates Medic may charge and how those may be adjusted; and the fees Medic shall pay to SEMSC and other parties in exchange for its franchise. An exhibit to the Agreement details fines to be assessed against Medic for particular types of shortcomings in its adherence to required performance standards.

The Agreement provides that SEMSC can terminate the Agreement in the event of a "major breach" by Medic, and defines what constitutes such a breach on Medic's part. It also sets forth the procedure to be followed in the event SEMSC decides that an emergency takeover of Medic's operations is necessary to avoid endangering public health and safety. The Agreement defines "minor breach" to include various types of failure on Medic's part to comply with the level of service required by the Agreement;

2

minor infractions of applicable laws and regulations by Medic; or any other breaches "not specifically defined as major breaches."

The Agreement also provides that Medic can terminate the Agreement in the event of a major breach by SEMSC, and defines that to mean either a "breach by SEMSC which substantially endangers the public health and safety," or—more pertinent for our purposes—if "SEMSC fails to take reasonable steps to protect Medic's contractual right to provide all emergency ambulance service, advanced life support and Parahospital medical services in the exclusive operating area as provided by this Agreement." A separate subsection of the Agreement reiterates that "SEMSC shall take all reasonable steps to ensure that Medic is, during the period of this [Agreement], the sole provider of ALS[1] Ambulances for Solano County." (Original capitalization.) Various defined exceptions to Medic's exclusivity rights are provided in an exhibit to the Agreement.

The Agreement contains several provisions relating to the process to be followed in the event of an alleged major breach or other dispute. The first of these is section 6.0, which governs major breaches. Subsections 6.1 through 6.9 apply to situations in which the agency administrator of SEMSC (the Agency Administrator) declares that a major breach has occurred on Medic's part.

Major breaches by SEMSC are addressed in a separate subsection, numbered 6.10 (section 6.10). Section 6.10 reads in its entirety as set forth below.

---

**1** It appears from a July 2006 resolution (the Resolution) adopted by the SEMSC's board of directors (the Board), which is attached as an exhibit to the fourth amended complaint, that "ALS" is an abbreviation for "advanced life support," which is a particular level of ambulance service. The other levels of service, with their abbreviations, are basic life support (BLS), limited advanced life support (LALS), and critical care transport (CCT) (also referred to as specialty care transport, or SCT). As will be discussed *post*, the Resolution purported to protect Medic's exclusivity rights, but Medic alleges that SEMSC failed to implement it.

"6.10.1[:] If Medic determines that a major breach has occurred, then Medic shall notify[2] the SEMSC Medical Director [(the Medical Director)] in writing of such existence and occurrence and the reason, if any, it endangers public health and safety and the SEMSC shall have a reasonable period of time to correct the deficiency. Medic and the EMS Agency [i.e., SEMSC] shall attempt in good faith and with reasonable effort to resolve all allegations between and among themselves without recourse to other remedies available herein.

"6.11.2[:] [*sic*] If an allegation of major breach cannot be resolved under the above, Medic shall notify the SEMSC Agency [Administrator**3**] in writing and the matter shall be referred to the SEMSC Board for resolution.

"6.12.3[:] [*sic*] Medic shall not be precluded hereby from seeking further relief through litigation should the matter not be resolved by the SEMSC Board to its reasonable satisfaction."

A separate section, section 10.0, addresses "contract monitoring, administration and dispute resolution." (Original capitalization omitted.) It requires SEMSC to "utilize a multi-layered system to enforce the terms and conditions of this Agreement," and provides that "Medic shall assume the initial role by ensuring that its personnel and equipment comply with the terms of this Agreement at all times." This provision is followed by a diagram of the "hierarchy to be employed by the SEMSC to enforce [the Agreement]." The diagram shows Medic at the bottom, with the Agency Administrator as the next layer up, followed by the Medical Director, and culminating with the Board at the top. It provides that Medic must "formally designate" persons to attend and represent Medic at meetings of various standing committees, and participate in the implementation of system requirements specified in an exhibit to the Agreement.

---

**2** The Agreement provides that "[a]ny notice necessary to the performance of this Agreement shall be given in writing by personal delivery" or by mail to specified addresses.

**3** The Agency Administrator is referred to in section 6.11.2 as the Agency Director, but this appears to have been an inadvertent error.

4

Section 10.2 provides for an appeals procedure, defined in exhibit G to the Agreement (Exhibit G). Section 10.5 states that both Medic and SEMSC may bring any matter relating to the Agreement, including allegations of minor breach, to the Agency Administrator for resolution, followed by an appeal procedure as set forth in Exhibit G.[4] The section goes on to say: "However, except as provided herein, neither party shall thereby be precluded from pursuing any other legal or equitable remedies which may be available to it." A separate section of the Agreement requires Medic to "keep SEMSC informed at all times as to litigation, or reasonable expectations of litigation, insofar as it pertains to Medic's operations under this Agreement . . . ."

Regarding waiver, the Agreement provides that "[w]aiver of a breach or failure to perform any provision . . . shall not be deemed a waiver of future performance nor shall it prejudice the waiving party's right to require strict performance of the same provision or any other provision. No term or condition of this Agreement shall be waived except by an instrument, in writing, signed by the parties hereto." Another provision specifies that "No verbal [*sic*[5]] agreements or conversations prior or subsequent to the execution of this Agreement shall affect or modify any of the terms or conditions of this Agreement unless reduced to writing." The last section of the Agreement, entitled "Entire Agreement," provides that "This Agreement, including any exhibits referenced herein, constitutes the entire agreement between the parties and there are no inducements, promises, terms, conditions or obligations made or entered into by SEMSC or Medic other than those contained herein."

---

[4] Despite the broad language of section 10.5, Exhibit G itself is framed in contemplation of appeals by Medic from the imposition of fines and penalties imposed by SEMSC. For example, the first step in the process is that the Agency Administrator "reviews the circumstances for imposing a fine or penalty," and "determines that the grounds are sufficient to justify imposing the fine or penalty." One section of Exhibit G consists of a nonexclusive list of grounds for appeal of penalties. Nothing in Exhibit G sets forth any grounds for appeals by Medic of any other type of decision by SEMSC.

[5] We understand this to be a reference to *oral* agreements or conversations. Neither party contends otherwise.

**B. Communications and Negotiations Regarding Breach of Exclusivity Claim**

The operative pleading for purposes of this appeal is Medic's fourth amended complaint (FAC). By way of introduction, the FAC alleges in general terms that SEMSC "failed to uphold the material provisions of the Agreement, including specifically its contractual obligation to take all reasonable steps to protect Medic's right to exclusively provide all ALS ambulance services in the EOA" (i.e., the "Exclusive Operating Area" defined in the Agreement). Without specifying a time frame, the FAC alleges that "[d]uring the period of the Agreement, Medic from time to time learned of patient transports by competing ambulance providers that it believed were in violation of the exclusivity provisions of the Agreement, in that Medic believed that those transports were ALS transports or should have been characterized as ALS transports and were therefore to be performed by Medic." When this occurred, "[a]t the behest of the Agency Administrator and the Medical Director and consistent with the terms of the Agreement regarding contract monitoring, these alleged violations were reported in writing to the Agency Administrator and his staff for investigation. Medic was repeatedly assured that SEMSC would investigate the incidents and protect the contractual rights of Medic relating to the ALS EOA as required by the Agreement."

The FAC also alleges—again in general terms, and without specifying any dates—that SEMSC's investigations of the violations of Medic's exclusivity rights were untimely, inadequate, and sometimes nonexistent. It alleges that to the extent SEMSC did investigate the violations, it "communicated to Medic that the incidents were either isolated and being resolved or permissible exceptions." It also alleges that Medic "relied entirely on SEMSC to track the transports and to monitor and enforce [Medic's] exclusivity rights," which Medic had no way of doing, and that SEMSC failed to fulfill its contractual obligation to "adequately audit and monitor transports by competing ambulance providers" and "investigate potential violations . . . ."

The first specific date mentioned in the FAC is July 2006, when the SEMSC Board adopted the Resolution (referred to *ante*). As described in the FAC, the Resolution required all ambulance providers operating in the EOA in Solano County to register with

6

SEMSC to obtain its authorization to operate and to refrain from providing service at any level and in any area of Solano County as to which SEMSC had awarded exclusivity rights.  The FAC alleges that SEMSC failed to implement the Resolution until April 2008, and then only after Medic demanded that SEMSC verify that it had done so.

The FAC alleges that until September 7, 2007, SEMSC "misled Medic as to both the scope and nature of the exclusivity violations and SEMSC's efforts to enforce [Medic's] exclusivity rights [under] the Agreement."  Although "SEMSC and its agents and/or employees had actual knowledge prior to September 7, 2007, that competing ambulance providers were frequently transporting ALS patients within the EOA in violation of Medic's contractual rights under the Agreement," it was not until SEMSC released an internal audit (the Audit), on or about September 7, 2007, that it was "for the first time demonstrated to Medic that several ambulance companies were blatantly violating the exclusivity provision granted to Medic under the Agreement," and that "these violations were not merely isolated incidents as had been previously reported by SEMSC to Medic."[6]

The FAC alleges that at a meeting of the SEMSC Board in October 2007, after the Audit results were released, Medic provided *oral* notice to the Board that SEMSC had committed a major breach of the Agreement by not taking all reasonable steps to protect Medic's exclusivity rights.  The Board responded by "remov[ing] the matter from the Agency Administrator and the Medical Director and form[ing] an Ad Hoc Committee . . . to specifically address Medic's complaints that its contractual exclusivity rights were being violated."  The Ad Hoc Committee was charged with "investigat[ing] Medic's complaints on behalf of the Board and attempt[ing] to resolve the matter directly with

---

[6] SEMSC contends this allegation is contradicted by allegations made in earlier versions of Medic's complaint.  This issue is discussed *post*.

Medic," and was appointed "to act as the final arbiter of Medic's allegation of major breach."[7]

The FAC alleges that the Board created the Ad Hoc Committee and charged it with resolving the issue "even after having been reminded by Medic of the procedures for resolution as set forth in Section 6.10, et seq., of the Agreement." When the Board created the Ad Hoc Committee, SEMSC "knew and intended that Medic . . . would be reasonably induced to rely on the SEMSC Board's representations and stated intentions that the resolution of the issue . . . was in the sole hands of the SEMSC's Ad Hoc Committee and the SEMSC Board and no further notice to the Medical Director or Agency Administrator was required of Medic under Sections 6.10.1 and 6.11.2 of the Agreement." Medic relied upon and acted on these representations by "participat[ing] in good faith in the Ad Hoc Committee meetings," and "was ignorant of the true state of facts, namely that SEMSC would later . . . assert that Medic had failed to exhaust administrative remedies under Section 6.10 of the Agreement."

According to the FAC, SEMSC intended that Medic rely on its representations by taking no further action under section 6.10 of the Agreement, and that Medic would instead deal only with the Ad Hoc Committee in attempting to resolve the issue. Indeed, if not for SEMSC's "representations and stated intentions . . . concerning . . . the formation of the Ad Hoc Committee to act as the final arbiter of Medic's allegation of major breach, Medic would have . . . followed the requirements of Section 6.10" of the Agreement. Thus, the FAC alleges if SEMSC is allowed to defend against Medic's claims on the basis of Medic's failure to exhaust administrative remedies, Medic will be damaged by its reliance on SEMSC's representations, because Medic will be unable to pursue its claims through litigation.

---

**7** The FAC also alleges that the Board's action in delegating the matter to the Ad Hoc Committee constituted an oral modification of the Agreement; that the agreement, as orally modified, was fully executed within one year; and that by delegating to the Ad Hoc Committee the task of resolving the issue, SEMSC waived the Agreement's requirement that Medic give written notice of any alleged major breach of the Agreement to the Agency Administrator and Medical Director.

From October 2007 through July 2008, Medic met with the Ad Hoc Committee, and continued to communicate with the SEMSC Board Chair and Solano county counsel, who were aware of the actions of the Ad Hoc Committee. During this period, Medic also continued to report newly discovered violations of Medic's exclusivity rights to the Agency Administrator and the Medical Director. On March 19, 2008, Dr. Paul Kivela, a Medic representative, sent an email to the Medical Director, Dr. Richard Lotsch, in which Kivela reported that that "the EMS Agency [i.e., SEMSC] suspects that 'pirating' of ALS calls has occurred," and suggested the adoption of criteria and procedures to address the problem.[8] Lotsch was "indisputably made aware," through other written and in-person communications, of SEMSC's failure to enforce Medic's exclusivity right by preventing ALS calls from being mischaracterized.

On August 25, 2008, Medic for the first time received a copy of an independent audit, the Fitch Report, which SEMSC had requested and obtained. The Fitch Report was based on data which had been in SEMSC's possession for some time, but which SEMSC had not revealed to Medic. Unbeknownst to Medic until August 28, 2008, the Fitch Report had been completed in late May 2008, three months before it was provided to Medic. The Fitch Report "demonstrated that the number of ongoing ALS calls taken by non-authorized ambulance providers was substantially greater than was previously known to Medic and substantially greater than demonstrated in the [internal] Audit results obtained in September, 2007."

On August 28, 2008, three days after Medic obtained the Fitch Report, the Agency Administrator of SEMSC reported to the Board that he was not enforcing, and was unable to enforce, Medic's exclusivity rights under the Agreement. After that, "SEMSC took no further action to protect Medic's rights to be the exclusive provider of ALS ambulance service in the EOA."

---

[8] SEMSC's contends that the versions of this allegation set forth in earlier versions of Medic's complaint were sham. This issue is discussed *post*.

9

On September 5, 2008, Medic served a formal claim pursuant to Government Code section 910 (dated September 4, 2008) on Solano County, its counsel, the Board, and the Agency Administrator, for damages resulting from the failure to enforce Medic's exclusivity rights. The FAC alleges that this claim also satisfied the requirement of written notice in section 6.11.2 of the Agreement. SEMSC never responded to the claim, nor did it inform Medic that it was taking the position that Medic's claim was deficient or that Medic had failed to exhaust its administrative remedies.

### C. Trial Court Proceedings

On September 3, 2009, Medic filed a complaint against SEMSC in the Solano County Superior Court. As already noted, several rounds of demurrers and amended complaints ensued. Finally, on August 17, 2011, Medic filed the FAC, pleading causes of action for breach of contract and breach of the duty of good faith and fair dealing. On August 30, 2011, SEMSC again responded with a demurrer.

On January 6, 2012, the trial court entered an order sustaining the demurrer to the FAC without leave to amend, and ordering the matter dismissed in its entirety with prejudice. On February 29, 2012, Medic filed a notice of appeal.[9]

---

[9] No judgment of dismissal was entered. This appeal is therefore premature. Nonetheless, in the interest of judicial economy, we shall deem the trial court's order sustaining the demurrer without leave to amend to incorporate a judgment of dismissal. (See, e.g., *Smith v. Hopland Band of Pomo Indians* (2002) 95 Cal.App.4th 1, 3, fn. 1.) This is particularly appropriate here, inasmuch as SEMSC never moved to dismiss the appeal, and it is now fully briefed and ready for decision. (See *Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1013, 1019.) Moreover, the clerk of the Solano County Superior Court served the parties with notice of the trial court's order using Judicial Council form CIV-130. This form may be used to give notice of entry either of a judgment or of an order, and the clerk failed to indicate which type of notice was intended. Thus, the absence of an appealable judgment may to some extent be the result of an oversight on the part of the trial court, which we have the discretion to remedy by construing the order as an appealable judgment. (See *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 920-921, disapproved on other grounds in *Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1074.)

10

## III.

## DISCUSSION

### A.  Standard of Review and Effect of Sham Fact Allegations

Our standard of review of a trial court's ruling sustaining a demurrer is governed by well settled principles.  " 'A demurrer tests the sufficiency of a complaint as a matter of law.' [Citation.]" (*Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1379.) Accordingly, we review the trial court's ruling de novo, exercising our independent judgment.  (*Ibid.*; *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501.)  " 'The judgment must be affirmed "if any one of the several grounds of demurrer is well taken. [Citations.]" [Citation.]  However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory.  [Citation.]  And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment.' [Citation.]" (*Hale v. Sharp Healthcare*, *supra*, 183 Cal.App.4th at p. 1379.)

Normally, "[i]n reviewing the propriety of the sustaining of a demurrer, the 'court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded.  [Citations.]' " (*Hale v. Sharp Healthcare*, *supra*, 183 Cal.App.4th at p. 1379.)  Thus, in most appeals arising from an order sustaining a demurrer, our statement of facts simply summarizes the allegations of the plaintiff's complaint, and our opinion assumes the truth of those facts.[10]  (See, e.g., *Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 629, fn. 3.)

In the present case, however, SEMSC argues that certain of the allegations in the FAC contradict those pleaded in earlier versions of Medic's complaint, and should therefore be disregarded as a sham.  SEMSC is correct that a plaintiff cannot survive a demurrer by pleading facts flatly inconsistent with those alleged in an earlier version of

---

[10]  We do not, however, assume the truth of contentions, deductions or conclusions of law.  (*Hale v. Sharp Healthcare*, *supra*, 183 Cal.App.4th at p. 1379.)

11

the plaintiff's complaint. (See *Banis Restaurant Design, Inc. v. Serrano* (2005) 134 Cal.App.4th 1035, 1044 [when complaint contains allegations fatal to cause of action, plaintiff cannot avoid defects by filing amended complaint that omits problematic facts or pleads inconsistent facts].) Thus, to the extent any allegations in Medic's FAC squarely contradict those made in its earlier pleadings, we cannot accept their truth. In addition, we must disregard facts alleged in the pleadings if they are contradicted by exhibits to the complaint. (See *id.* at pp. 1044-1045.)

On the other hand, the sham pleading doctrine is intended to enable courts to prevent abuse of process, not to prevent honest complainants from correcting erroneous allegations or clarifying ambiguous facts. (See *Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 425-427 [where party's counsel offered plausible explanation for change in factual allegations in amended complaint, trial court improperly granted summary judgment against plaintiffs based on treatment of earlier allegations as binding judicial admissions].) Thus, "[a]n amendment which supplements a pleading with new facts which are neither inconsistent nor contradictory is permissible." (*Parsons v. Tickner* (1995) 31 Cal.App.4th 1513, 1530.) Where a plaintiff's amended complaint presents a fuller explanation of the operative circumstances, and is not fatally inconsistent with its earlier complaint, the facts alleged in the amended complaint should be accepted for demurrer purposes. (See *Morgan Phillips, Inc. v. JAMS/Endispute, L.L.C.* (2006) 140 Cal.App.4th 795, 802, fn. 2.)

In accord with the above principles, in our summary of the facts, *ante*, we noted those factual allegations in the FAC that SEMSC contends are a sham. Before analyzing the legal sufficiency of the FAC, we must determine whether these allegations should be accepted as true or disregarded.

### B. Allegations SEMSC Contends Are Sham

#### 1. When Medic Learned of Exclusivity Violations

SEMSC's brief on appeal characterizes the first two versions of Medic's complaint (the original and first amended versions) as alleging that Medic first learned of the exclusivity violations on August 25, 2008, and argues that this allegation contradicts

12

allegations made in later versions of the complaint. This is based on a misreading of the allegations of Medic's original and first amended complaints. In those versions of the complaint, Medic alleged that it was unaware until August 25, 2008 (when it received the Fitch Report) that (1) SEMSC had known at least since May 2008 that Medic's exclusivity rights were being violated, and (2) SEMSC had not disclosed these violations to Medic. These statements do not address the issue of when *Medic itself* first learned of the violations.

Medic's second amended complaint added the allegation that August 25, 2008, was when "Medic initially received information . . . [regarding] the breadth and extensive nature of the exclusivity violations . . . ." It also alleged that "[o]n or about August 25, 2008, Medic learned of violations of the exclusivity provision of the Agreement." However, none of the first three versions of the complaint alleged that August 25, 2008, was the *first* time Medic itself learned that there had been *any* violations of its exclusivity rights. Thus, contrary to SEMSC's argument on appeal, the second amended complaint's references to Medic's communications with SEMSC about the issue prior to August 25, 2008, do not contradict the allegations in other versions of Medic's complaint regarding what Medic learned when it obtained the Fitch Report.

SEMSC also argues that the earlier versions of the complaint contradict an allegation added in Medic's third amended complaint regarding Medic's knowledge of the exclusivity violations. Again, this argument is based on a misreading of the third amended complaint. SEMSC's brief says the third amended complaint alleged that September 7, 2007, was when Medic first learned of SEMSC's breach. What the third amended complaint actually alleged was that the internal audit SEMSC released on September 7, 2007 "for the first time demonstrated to Medic that *several* ambulance companies were *blatantly* violating the exclusivity provision" and that "Medic only then initially learned of the *possible extent and ongoing nature* of the exclusivity violations" which SEMSC had previously told Medic were "merely isolated incidents." (Italics added.) Thus, nothing in this aspect of the third amended complaint contradicts any of

13

the allegations in the earlier versions. The subsequent FAC repeats the same allegations on these points that were already pleaded in the third amended complaint.

In short, all of the versions of the complaint, taken together, paint the following picture. Medic knew prior to September 2007 that violations of its exclusivity rights were occurring, but believed SEMSC's assurances that these were isolated incidents. Then, on September 7, 2007, Medic learned for the first time from SEMSC's internal audit that the violations were not isolated; that several of Medic's competitors were blatantly violating Medic's exclusivity rights; and that the problem was possibly more serious than SEMSC had given Medic reason to believe. Finally, on August 25, 2008, when Medic obtained the Fitch Report, Medic learned for the first time that SEMSC had been concealing the extent of the violations from Medic. The Fitch Report also confirmed Medic's suspicions that the violations were even broader and more extensive than indicated by the September 2007 internal audit.

The foregoing version of the events is essentially what is pleaded in the FAC. Nothing in Medic's earlier pleadings contradicts it. Accordingly, we construe the FAC as alleging these facts, assume their truth for purposes of this appeal, and reject SEMSC's argument that this aspect of the FAC is a sham. (See *Parsons v. Tickner*, *supra*, 31 Cal.App.4th at p. 1530; *Morgan Phillips, Inc. v. JAMS/Endispute, L.L.C.*, *supra*, 140 Cal.App.4th at p. 802, fn. 2.)

### 2. *Written Notice of Breach*

As already noted, on March 19, 2008, a Medic representative sent an email to the Medical Director conveying Medic's suspicions that ALS calls were being pirated, and thus its exclusivity rights were being violated. In that same email, it was suggested that criteria be adopted and procedures implemented to address the problem. This email was referenced in, but not attached to, Medic's second amended complaint. In that version of the complaint, Medic characterized the email as having constituted written notice of a major breach to the Medical Director, in compliance with the notice provisions of the Agreement.

14

In Medic's third amended complaint, the email was attached as an exhibit. In sustaining SEMSC's demurrer to the third amended complaint, the trial court properly looked to the contents of the email, rather than Medic's characterization of it, and determined that it did not qualify as a formal written notice of a major breach under the terms of the Agreement. (See *Banis Restaurant Design, Inc. v. Serrano*, *supra*, 134 Cal.App.4th at pp. 1044-1045.)

Presumably for that reason, in the FAC, Medic alleged that the notice of claim served by Medic on September 5, 2008, constituted written notice of a major breach under section 6.11.2 of the Agreement. However, section 6.11.2 of the Agreement is the *second* step in the procedure governing claims by Medic of a major breach of the Agreement. The first step, set forth in section 6.10.1, is that Medic is to notify the Medical Director in writing, and then engage in a good faith attempt to resolve the matter. Neither the third amended complaint, nor the FAC, alleges facts showing that Medic gave *written* notice of a claim of major breach to the Medical Director as required by section 6.10.1. For purposes of this appeal, therefore, we decline to assume the truth of Medic's allegation that it complied with the notice requirements of section 6.10 of the Agreement.

### C. Excuse from Compliance

As both parties acknowledge in their briefs on appeal, because SEMSC is a government agency, Medic cannot sue it for breach of contract without first complying with the claims procedures set forth in the Agreement. These procedures function as a substitute for the government claims procedures required under the Government Claims Act (Gov. Code, § 810 et seq.). (See generally *Arntz Builders v. City of Berkeley* (2008) 166 Cal.App.4th 276, 287-289 (*Arntz*).) Thus, Medic's failure to comply with section 6.10 of the Agreement vitiates its claim against SEMSC unless Medic can establish a legally valid ground for excusing it from that requirement.

When the trial court sustained SEMSC's demurrer to the third amended complaint, it granted leave to amend specifically in order to allow Medic to allege facts in support of the contention that SEMSC either was estopped from relying on Medic's failure to

15

comply with the contractual claims procedure, or had waived its right to enforce that provision of the contract. Accordingly, we consider the estoppel and waiver issues first, and then proceed to assess Medic's contentions on appeal that it actually or at least substantially complied with the contractual claims procedure, and, alternatively, that SEMSC agreed to an oral modification of the contract in this regard.

### 1. Estoppel

In its ruling on SEMSC's demurrer to the FAC, the trial court acknowledged that Medic had attempted to plead estoppel, but ruled that Medic had not adequately alleged the necessary facts. On appeal, Medic contends this was error.

"The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citation.]"[11] (*Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725.) The elements of equitable estoppel may also be described as follows: "(1) The party to be estopped has engaged in blameworthy or inequitable conduct; (2) that conduct caused or induced the other party to suffer some disadvantage; and (3) equitable considerations warrant the conclusion that the first party should not be permitted to exploit the disadvantage he has thus inflicted upon the second party." (*City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 488 (*City of Hollister*).)

A government entity defendant can be estopped from raising the plaintiff's failure to file a claim under the Government Claims Act as a bar to the plaintiff's right to sue. " 'It is well settled that a public entity may be estopped from asserting the limitations of

---

[11] The detrimental reliance must be reasonable. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 35; *Berkeley Police Assn. v. City of Berkeley* (1977) 76 Cal.App.3d 931, 938.)

16

the claims statute where its agents or employees have prevented or deterred the filing of a timely claim by some affirmative act. [Citations.]' [Citation.] 'The purpose of the requirement that claims be filed is to provide the public entity with full information concerning rights asserted against it, so that it may settle those of merit without litigation. Therefore, the public entity cannot frustrate a claimant's ability to comply with the statutes enacted for its benefit and then assert noncompliance as a defense. [Citation.]' [Citation.]" (*Ard v. County of Contra Costa* (2001) 93 Cal.App.4th 339, 346-347.)

SEMSC argues that "estoppel is applied in a very limited manner against public entities, and only in those special cases where the interests of justice clearly require it," citing only a 50-year-old case, *Imperial Beach v. Algert* (1962) 200 Cal.App.2d 48, 52, in support of this proposition. SEMSC also cites cases from the same era, *Adler. v City of Pasadena* (1962) 57 Cal.2d 609, 615, and *City of Los Angeles v. Industrial Acc. Com.* (1965) 63 Cal.2d 255, 257-258, for the proposition that "[t]o invoke estoppel against a public entity, that entity must have acted in an unconscionable or unreasonable manner or have set out to, and did, take unfair advantage of the plaintiff."

However, the law on this point has changed since the cases relied on by SEMSC were decided. In 1970, our Supreme Court formulated a less stringent test that still governs today: "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 496-497.)

Thus, in determining whether a party has properly pleaded estoppel against a government entity, we apply the same principles as in a case involving private parties, with only one addition. If the other elements of estoppel are properly pled, we must also consider " '[w]hether the injustice [that] would result from a failure to uphold an estoppel is of sufficient dimension to justify the effect of the estoppel on the public interest . . . .' " (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1360 (*Feduniak*),

17

quoting *Smith v. County of Santa Barbara* (1992) 7 Cal.App.4th 770, 776.) This is a question that " 'must be decided by considering the matter from the point of view of a court of equity.' [Citation.]" (*Feduniak*, at p. 1360.)

"The goals of the claims statutes [i.e., the Government Claims Act] are to provide entities with sufficient information to investigate and appropriately resolve claims and to plan for potential liabilities." (*DiCampli-Mintz v. County of Santa Clara* (2012) 55 Cal.4th 983, 994.) In the present case, according to the allegations of the FAC, SEMSC had actual notice at least as early as September 2007, from its own internal audit, that Medic's exclusivity rights were being violated; SEMSC commissioned an external investigation of the extent of those violations, resulting in the Fitch Report; and SEMSC then sought to resolve Medic's claims by setting up a special committee (the Ad Hoc Committee) to deal with them. Accordingly, assuming the truth of the allegations in Medic's FAC, applying estoppel against SEMSC in the present case would not frustrate the goals of the Government Claims Act.

The question remains whether the FAC adequately alleges the elements of equitable estoppel against SEMSC. We note, at the outset, that the general fact pattern alleged by Medic in this case has been described by one court as a paradigm for the proper application of equitable estoppel. "The paradigmatic equitable estoppel arises where a prospective defendant induces a prospective plaintiff not to protect his rights, and when the plaintiff attempts to assert them, raises a defense that exploits the plaintiff's lapse. The classic example is the assertion of a procedural bar, such as a statute of limitations, after the defendant has induced plaintiff not to file suit within the allotted time. If the court is satisfied that the facts and the equities justify application of the doctrine, it will hold the defendant estopped to assert the defense, and the matter will proceed as if the claim had been seasonably asserted." (*City of Hollister*, *supra*, 165 Cal.App.4th at p. 487.) Moreover, the determination of equitable estoppel ordinarily is a question of fact for the trier of fact, unless the facts are undisputed and can support only one reasonable conclusion as a matter of law. (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 319.) Thus, the question of equitable estoppel is generally inappropriate for

18

resolution at the demurrer stage. (*Ard v. County of Contra Costa*, *supra*, 93 Cal.App.4th at p. 347.)

In its ruling on SEMSC's demurrer, the trial court concluded that Medic had pleaded "conclusory allegations essentially rephrasing the various elements of estoppel." Nonetheless, the court went on to sustain the demurrer on the grounds that Medic had failed to allege "any specific facts showing [(1)] that [SEMSC] knew or intended that its creation of the Ad Hoc Committee would be construed as a satisfactory substitute for the written claims procedure, [(2)] that [Medic] was ignorant of the true state of facts, or [(3)] that [Medic] actually acted upon [SEMSC's] conduct."

It was not necessary, however, for Medic to allege that SEMSC *knew or intended* that Medic would construe SEMSC's conduct as dispensing with the need for compliance with the contractual claims requirement. As SEMSC implicitly acknowledges in its brief, estoppel may apply even if the estopped party did not *intend* to induce the other party's detrimental reliance, so long as the estopped party "acted in such a way that the party asserting estoppel would have a right to believe that that was its intention." (*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 59 (*DRG v. Chopstix*); see also *City of Hollister*, *supra*, 165 Cal.App.4th at p. 488 [application of equitable estoppel is not limited to situations amounting to fraud]; 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 192, p. 530 ["Actual fraudulent intent is ordinarily unnecessary to raise an estoppel if the circumstances are such that a fraud would be perpetrated by permitting a denial of the representations"]; cf. *Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 43 [defendant will be estopped to invoke statute of limitations where defendant's conduct, relied on by plaintiff, induced plaintiff to refrain from instituting legal proceedings; "[i]t is not necessary that the defendant acted in bad faith or intended to mislead the plaintiff"].)

In our view, Medic's allegations adequately allege that SEMSC's conduct led Medic reasonably to believe SEMSC would not insist on receiving formal written notice of Medic's claims. In particular, the FAC alleges that when the violations of Medic's exclusivity rights were brought to the attention of the Board, its response was not to

demand that Medic comply with the process outlined in section 6.10 of the Agreement, but rather to establish the Ad Hoc Committee and charge it with resolving Medic's complaints on behalf of the Board. Given these allegations, a trier of fact could properly find that it was reasonable for Medic to believe that formal notice of its claims was not necessary in order to preserve Medic's right to pursue litigation if the parties could not resolve their dispute.

Second, the FAC alleges Medic was unaware that SEMSC intended to insist on Medic's formal adherence to the contractual claims resolution procedure. Indeed, SEMSC itself appeared, for all practical purposes, to have telescoped that process into the single step of attempting a resolution under the auspices of the Ad Hoc Committee. In our view, this is an adequate allegation that Medic was ignorant of the true facts.

Finally, the FAC alleged that if not for SEMSC's representations and stated intentions concerning the formation of the Ad Hoc Committee to act as the final arbiter of Medic's allegation of major breach, Medic would have followed the requirements of Section 6.10 of the Agreement. We do not see how Medic could have alleged any more clearly that its course of action was induced by SEMSC's conduct.

In short, upon our review of the record and the parties' arguments, we conclude that the trial court erred in sustaining SEMSC's demurrer to the extent that the court's ruling was premised on the conclusion that Medic had not adequately pleaded estoppel. Medic's allegations in that regard, if true, were adequate to estop SEMSC from relying on Medic's failure to exhaust the contractual claims procedure as a bar to Medic's claim for damages.

### *2. Waiver*

In addition to its argument on estoppel, Medic also contends that SEMSC waived Medic's compliance with the contractual claims procedure. Estoppel and waiver are related doctrines, "often invoked in the same breath, and sometimes confused with [one another]." (*City of Hollister*, *supra*, 165 Cal.App.4th at p. 487.) The critical difference between the two is that " ' "[w]aiver always rests upon intent. Waiver is the intentional relinquishment of a known right after knowledge of the facts.["] [Citations]. The

20

burden, moreover, is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver." ' [Citations.]" (*DRG v. Chopstix*, *supra*, 30 Cal.App.4th at p. 60.)

In the present case, the FAC does not allege facts that, if true, would establish that SEMSC intentionally relinquished its right to require Medic's compliance with the contractual claims procedure. Medic does not allege that SEMSC ever manifested an intent to waive section 6.10 of the Agreement, or informed Medic that SEMSC did not expect Medic to comply with that provision in making its exclusivity violation claims.

Moreover, the Agreement itself provides that all waivers of its terms must be in writing, and Medic does not allege the existence of such a writing, nor does Medic allege facts showing that SEMSC intended to waive its contractual right to require that waivers of any provision in the Agreement be documented in writing. (Cf. *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 141 [parties' prior conduct may demonstrate waiver of provision requiring amendments to contract to be in writing].) Accordingly, we are not persuaded that the trial court erred in sustaining SEMSC's demurrer to the extent that Medic sought to plead waiver as an excuse for its failure to comply with the contractual claims provision.

### 3. Actual or Substantial Compliance

Medic contends that the trial court erred in ruling that Medic did not allege facts showing that it actually or substantially complied with the contractual claims procedure. Medic premises its argument for actual compliance on the March 19, 2008 email from Kivela to Lotsch, SEMSC's Medical Director. As discussed *ante*, however, we agree with SEMSC and the trial court that this email cannot be construed as the written notice called for by section 6.10.1 of the Agreement. (See *Shaefer Dixon Associates v. Santa Ana Watershed Project Authority* (1996) 48 Cal.App.4th 524, 533.) Lotsch's actual knowledge that Medic's exclusivity rights were being violated is not a substitute for that written notice. (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 738 [" 'claims

21

statutes must be satisfied even in [the] face of the public entity's actual knowledge of the circumstances surrounding the claim.' [Citation.]"].)

Moreover, Medic alleged no facts showing that it complied, even substantially, with the requirement of section 6.11.2 that Medic notify the Agency Administrator in writing *after* notifying the Medical Director, and *after* attempting without success to resolve the matter informally. Medic's September 5, 2008 notice of claim does not constitute such compliance, because it did not reference the contractual claims procedure, and did not include any language that can be construed as giving notice to the Agency Administrator of the failure of attempts to resolve the issue via the informal dispute resolution process, as required by section 6.10.1 of the Agreement. Accordingly, even if substantial compliance with a contractual claims procedure is sufficient (an issue we need not and do not resolve), we are not persuaded that Medic's FAC pleaded facts sufficient to show substantial compliance.

### 4. Oral Modification

Finally, Medic argues that the establishment of the Ad Hoc Committee constituted an oral modification of the contractual claims procedure, substituting the Ad Hoc Committee process for the one contemplated by the Agreement. As Medic acknowledges in its reply brief, however, the Agreement includes a provision precluding oral modification, and a contract that so provides can only be modified orally if the modification is fully executed by both parties. (*Miller v. Brown* (1955) 136 Cal.App.2d 763, 775.)

In order to allege sufficient facts to show modification of the Agreement by an executed oral agreement, Medic would have to plead facts showing *both* that SEMSC manifested an intent to agree to substitute the Ad Hoc Committee for the contractual claims process, *and* that the modification was fully performed by both parties. (See *Lockheed Missiles & Space Co. v. Gilmore Industries, Inc.* (1982) 135 Cal.App.3d 556, 559 [in order to be "executed," agreement must be fully performed on both sides].) As already noted, however, the FAC does not allege facts showing that SEMSC manifested the necessary intent. Moreover, full performance by SEMSC of the alleged modification

22

could not occur unless and until SEMSC complied with the new terms of the Agreement by recognizing Medic's right to file suit once the Ad Hoc Committee process concluded without resolving the dispute. Obviously, SEMSC did not fully perform that aspect of the alleged oral modification.

Accordingly, we are not persuaded that the trial court erred in rejecting Medic's contention that it was excused from compliance with the Contract's claims procedure by virtue of a fully executed oral modification.

## IV.

## DISPOSITION

The trial court's order sustaining SEMSC's demurrer to Medic's fourth amended complaint is REVERSED. This proceeding is remanded for further proceedings consistent with the views set forth in this opinion. Medic shall recover its costs on appeal.


_____
RUVOLO, P. J.


We concur:


_____
RIVERA, J.


_____
HUMES, J.